Filed 5/21/21  In re W.E. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re W.E. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E075810 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ2000016) |
| v. | OPINION |
| E.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.

Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

E.C. (Father) and L.O. (Mother) are the parents of two-year-old F.E., born in May 2019, and four-year-old W.E., born in August 2016. Father appeals from the juvenile court's jurisdictional findings.[1] He contends there was insufficient evidence to support the court's findings sustaining the petition against him under Welfare and Institutions Code[2] section 300, subdivisions (b) and (j). We find substantial evidence supports the juvenile court's jurisdictional findings and affirm the judgment.

**FACTUAL AND PROCEDURAL HISTORY**

Father and Mother lived together with their young children in Indio, California. Father worked full-time at a local hospital as a technician and part-time painting houses. Mother stayed home to watch the children and was taking classes at a community college.

In August 2019, the parents took three-month-old F.E. to a hospital, after he fell from their bed onto the tile floor. Hospital records noted F.E. was crying but consolable. The doctor observed a contusion on F.E. but no signs of nausea, vomiting, or headache, and thus did not order x-rays or a CT scan for F.E. The doctor discharged F.E. and told the parents to return if F.E.'s symptoms worsened.

In January 2020, approximately five months later, the family came to the attention of the Riverside County Department of Public Social Services (DPSS), after an immediate response referral was received alleging general neglect and physical abuse of

___

[1] Mother is not a party to this appeal.

[2] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

then eight-month-old F.E. who had sustained a broken femur. The parents reported F.E. had incurred the injury when he fell off a bed; the reporting party, however, was concerned the injury was not consistent with the parents' explanation. Due to F.E.'s injury and additional medical assessments requested by the trauma doctor, F.E. was transferred to a larger hospital, the Riverside University Health System Medical Center (RUHS), where x-rays and a CT scan were performed.

The x-rays and CT scan showed F.E. had a " 'buckle break' fracture" to the right metadiaphysis (femur), a parietal skull fracture, an occipital skull fracture, and "undulating cortical contours" on the right first rib that were "[s]uspicious for fracture." RUHS Dr. Sophia Grant found this evidence to be " 'suspicious for physical abuse,' " and recommended " 'immediate CPS involvement.' " Dr. Grant acknowledged that the leg fracture could have been caused from a fall from a bed, but it did not explain the skull fractures. She explained that an occipital skull fracture required a great deal of force and " 'the fact that it crosse[d] the suture line implie[d] even more force.' " Dr. Grant further noted that rib fractures were normally " 'caused by the squeezing of the chest.' " She reported that F.E. showed no sign of nutritional deficiency and that there was no evidence of metabolic bone disease, given that F.E.'s phosphorous level was elevated, which was the opposite of what would occur with metabolic bone disease.

DPSS and police officers responded to the hospital and interviewed the parents. Mother maintained F.E. had fallen from her bed onto the tile floor and denied knowledge of how F.E. had sustained the skull and rib fractures. She denied causing F.E.'s injuries

3

but noted feeling anxious and sad following F.E.'s birth. Father denied knowledge of how F.E. had sustained his injuries and stated Mother had been sad following F.E.'s birth. Father explained that he was asleep next to F.E. and awoke to find F.E. crying on the floor. Due to the nature of F.E.'s severe unexplained injuries, the children were taken into protective custody and placed with the maternal uncle pending further investigation.

On January 10, 2020, a petition was filed on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (e) (severe physical abuse of child under five), and (j) (abuse of sibling) based on F.E.'s severe and unexplained injuries.

At the January 13, 2020 detention hearing, the juvenile court formally removed the children from parental custody and maintained them with the maternal uncle. The parents were provided with services pending further proceedings and investigation. The court ordered DPSS not to interview the parents.

DPSS recommended the juvenile court find true the allegations in the petition and bypass reunification services for the parents pursuant to section 361.5, subdivision (b)(6). Based on interviews with the parents prior to the children's removal, the social worker believed F.E. may have sustained his injuries while in Mother's care and postpartum or other stressors may have been a factor. The social worker noted that while the parents had begun services, there was "a disconnect as to their understanding of what occurred to [F.E.] and how these injuries could have led to grave injury or his death." The social worker did not believe the children could safely be returned to the parents' care without

4

an explanation of what had actually occurred to F.E. or a showing what measures the parents would take to prevent further abuse to the children.

The matter was continued several times to obtain medical records and reports, conduct further investigations, and due to the general COVID-19 order. By May 2020, the parents had completed a parenting program and were participating in individual counseling. Father was discharged from counseling on May 8, 2020, because he " 'appear[ed] to be stable.' " Father had reduced his work schedule so he could be present for a longer duration at home and provide direct care and supervision to the children. The parents asserted that they would never allow an injury to happen to either child again.

The Indio Police Department had completed their investigation and filed a report with the district attorney's office. The detective found the parents' explanation that F.E. fell off the bed was inconsistent with his extensive injuries and the forensic report. The forensic report revealed F.E.'s injuries were "at different stages of healing, indicating the injuries did not occur in one event, but over time." The parents had stopped cooperating with the detective's investigation, presumably at the advice of counsel, when asked to demonstrate how F.E. fell off the bed.

Father reported to the detective that he first heard a "smack" sometime between 8:00 p.m. and 9:00 p.m. Father had finished his painting job and was taking a nap before his graveyard shift at the hospital was to begin at 10:30 p.m. Mother reported that at about 7:00 p.m., she had placed F.E. in the center of the bed with Father, then began

5

doing homework while also tending to W.E. Shortly after, F.E. "crawled off the bed and landed on all fours." The bed was about two and a half feet above the tile floor. After falling, F.E. was a "little bit whiny," but fell back to sleep. When Mother tried to give him a bath, F.E. cried uncontrollably. By that time, Father had gone to work. Mother phoned Father to inform him of F.E.'s condition, and they both decided to take F.E. to the emergency room. When asked how the other injuries may have occurred, the parents pointed to the previous fall. Mother noted it was normal for F.E. to roll around on the bed and that it was her usual practice to place things around F.E. on the bed so that he did not fall off the bed. Mother also recalled that the family was in a rear-end car accident when F.E. was a month old. Letters between Father and his insurance company showed the car accident occurred in May 2019, when F.E. was less than a month old.

Father retained Dr. Charles Hyman, a pediatrician for the past 52-plus years. Dr. Hyman had written, studied, and testified about suspected child abuse cases for over 19 years. Dr. Hyman submitted a voluminous report in which he concluded there was no scientific evidence of child abuse in this case, but bone fragility (a diagnosis not thoroughly considered by medical providers). Dr. Hyman reviewed F.E.'s medical records. He found the two skull fractures were older than the femur fracture and were consistent with Father's account of the first time F.E. had accidentally fallen off the bed and x-rays were not taken. Dr. Hyman disagreed with Dr. Grant's assessment that an occipital skull fracture necessarily meant that a great amount of force was involved. Dr. Hyman explained that " '[s]ingle head impacts can cause complex skull fracture

6

patterns," and can result in "bilateral fractures and fractures that cross suture lines." Dr. Hyman also stated that the "transverse compression fracture" to F.E.'s right femur was "completely explained by the mother's history of him having fallen from the parents' bed onto his knees and hands."

Dr. Hyman believed that F.E.'s medical history, physical findings, imaging, and laboratory findings all supported a diagnosis of bone fragility, even if osteoporosis could be ruled out. Dr. Hyman found no real evidence of a rib fracture. Dr. Hyman explained that the "cortical undulation" noted on F.E's right first rib did not reveal a fracture, and it was impossible to definitively say that it was evidence of a healing fracture as opposed to a "mineralization variant." Dr. Hyman was highly critical of what he viewed as flawed methods used by "child abuse pediatricians" (CAPs) to diagnose child abuse. Dr. Hyman opined that CAPs tended to presume child abuse from the absence of a known accidental history, even though the broader medical literature documented a prevalence of "occult fractures," that is, fractures that have no known history. Dr. Hyman concluded, "The parents should have been more careful when placing [F.E.] on their bed; however, per my 53 years of pediatric experience, their behavior is not uncommonly seen in a pediatric practice. The infant's fall histories explain all of his medical findings. He was never at high risk for death or serious injury."

The parents consistently visited the children, and the visits were gradually liberalized. During visits, the parents interacted appropriately with the children with no reported concerns. In February 2020, the juvenile court authorized weekend, day visits.

7

And, in August 2020, the court authorized overnight, weekend visits with possible extended special visits in the family home. During a special visit in September 2020, the social worker visited the family home and found it to be appropriate. Father reported that F.E. had slept in his crib while W.E. slept in the parents' bed. The children appeared happy to see their parents.

By September 2020, DPSS recommended the juvenile court find true the allegations in the petition and that the children be returned to the parents' care with family maintenance services. Although the parents had participated in services during the last nine months and had positive visits with the children, DPSS remained concerned for the children's safety due to their young ages and vulnerability and the severity of F.E.'s injuries.

The contested jurisdictional/dispositional hearing was held on September 25, 2020. The juvenile court admitted various reports, records, and documents into evidence and heard argument from the parties. Father's counsel and Mother's counsel argued the court should dismiss the petition. Father's counsel requested the court to credit Dr. Hyman's "comprehensive report," and argued a single instance of neglect does not necessarily establish a current risk of harm. Father's counsel stated that given the careers the parents were pursuing, any jurisdictional finding could "decimate" their lives. DPSS, joined by the children's counsel, asked the court to assert dependency jurisdiction based on a theory of negligence, and to continue supervising the dependency with family

maintenance services. The children's counsel noted that F.E. was injured from falling off the bed on two separate occasions, yet the parents still allowed W.E. to sleep in their bed.

The juvenile court found true the section 300, subdivisions (b) and (j) allegations, declared the children dependents of the court, returned the children to parental custody, and ordered family maintenance services. The court did not find true the section 300, subdivisions (a) and (e) allegations. The court stressed that it was not making a finding that the parents had intentionally abused F.E.; rather, the parents had negligently failed to supervise or protect F.E. The court reasoned that F.E. was seriously injured on multiple occasions, and that even after those incidents, the parents still allowed W.E. to sleep in their bed. The court considered dismissing the matter to protect the parents' careers, but concluded that this was not a relevant consideration under section 300. The court acknowledged that the parents had participated in services but found the children had not been in the home long enough to warrant withdrawing supervision. Father subsequently appealed.

## DISCUSSION

Father contends insufficient evidence supports the jurisdictional findings against him because his conduct only reflected a single, isolated act of negligence that was unlikely to repeat. He therefore believes the jurisdictional findings against him should be reversed. Father does not challenge the allegations against Mother.

Initially, Father asserts the justiciability doctrine should not apply to this case because his status as an " 'offending parent' could impact future dependency or family

9

law proceedings." He notes that he and Mother had separated during the pendency of this appeal and are now residing separately.[3] DPSS argues Father's jurisdictional arguments are not justiciable.

## A.    JUSTICIABILITY DOCTRINE

The juvenile court assumed jurisdiction based on findings against both Mother and Father, but Mother has not appealed, and Father does not challenge the jurisdictional findings concerning her. In fact, Father acknowledges Mother's conduct subjected the children to a current risk of harm sufficient to sustain a finding under section 300, subdivision (b)(1). DPSS thus contends the jurisdictional determinations found as to Mother are sufficient to support jurisdiction over the children. (See *In re Briana V.* (2015) 236 Cal.App.4th 297, 308 [" '[A] jurisdictional finding good against one parent is good against both.' "]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 (*I.A.*) ["an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"].)

Under the doctrine of justiciability, courts generally do not act upon or decide moot questions or abstract propositions, nor do they issue advisory opinions. (*I.A.*, *supra*, 201 Cal.App.4th at pp. 1490-1491.) "An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." (*Id*. at p. 1490.) "For this reason, an appellate court may decline to address the evidentiary support for any

---

[3] This fact was mentioned in appellant's motion to take additional evidence filed in this court on December 28, 2020, which is hereby granted.

10

remaining jurisdictional findings once a single finding has been found to be supported by the evidence," or is unchallenged. (*Id*. at p. 1492.)

On the other hand, an exception to this general rule has been recognized: "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as a basis for the dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Generally, to acquire jurisdiction under subdivision (b) of section 300, the juvenile court was obliged to find that the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result" of specified forms of parental neglect, including substance abuse, domestic violence, and failure to protect the child. (§ 300, subd. (b).) Findings that Father "knowingly or negligently" harmed the children or exposed them to a substantial risk of physical harm are "pernicious" and "could potentially impact the current or future dependency proceedings." (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.) We therefore will exercise our discretion to review the juvenile court's jurisdictional findings against Father.

B. JURISDICTIONAL FINDINGS AGAINST FATHER

The failure to protect (§ 300, subd. (b)) allegation as found true states, "While in the care and custody of the mother and father, the child, [F.E.] . . . suffered serious

11

physical harm as evidenced by a 'buckle break' fracture to his right leg, and upon further medical examination, the child was found to display multiple lucencies, a contour deformity at the right first rib and a skull fracture. Such conditions place the child at risk of suffering serious physical and developmental harm." The abuse of sibling (§ 300, subd. (j)) allegation is similar as above and pertains to F.E.'s sibling W.E.

1.  *STANDARD OF REVIEW*

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119.) We will affirm if there is reasonable, credible evidence of solid value to support the court's findings. (*Ibid*.)

" ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) Under this standard, our review " 'begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact.' " (*In re David H.* (2008) 165 Cal.App.4th 1626, 1633; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633.)

12

"We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  [Citation.]  The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)  "[I]nconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court."  (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1149.)

### 2.    *APPLICABLE LAW*

Section 300, in pertinent part, provides that a child may be declared a dependent under subdivisions (b) and (j) if:  (b) "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left," and (j) "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.  The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."  (§ 300, subds. (b) & (j).)

13

A juvenile court's exercise of dependency jurisdiction under section 300 is proper when a child is " 'of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] physical health and safety.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.) " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*I.J.*, *supra*, 56 Cal.4th at p. 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) "[S]ection 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383, superseded by statute on another ground as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.) "Evidence of past conduct may be probative of current conditions. [Citation.] To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]' [Citation.]" (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)

3.      *ANALYSIS*

In this case, F.E. suffered a broken femur, described as a "buckle" fracture, two skull fractures, and a rib fracture while in the care of the parents. Medical staff were concerned the injuries F.E. had sustained were non-accidental trauma given the multiple unexplained fractures. F.E.'s x-rays and CT scans included multiple lucencies and a contour deformity at the right first rib. Dr. Grant noted that the fracture to F.E.'s right leg may have been caused by F.E. falling off the bed, as Mother had described, but falling

from the bed did not explain the two skull fractures. Dr. Grant explained that an occipital skull fracture required a great deal of force, and due to it crossing the suture line suggested even more force. In addition, F.E.'s injuries were in different stages of healing and Father's expert's findings supports that the skull fractures were older.

The parents admitted F.E. had fallen off their bed and fell onto the tile floor and that this was not the first time F.E. had fallen off their bed. Father was aware that F.E. had fallen off the parents' bed in August 2019 when F.E. was three months old and had suffered a contusion. The same type of accident occurred around five months later in January 2020 when F.E. was eight months old. Mother reported that she had regularly placed F.E. on the bed to sleep. Father was aware Mother was placing F.E. on the bed next to him while he slept, but he took no actions to adequately supervise or protect the child. Due to his omission or negligent failure to adequately supervise or protect the child from the conduct, F.E. suffered serious injuries and the risk remained at the time of the jurisdictional hearing. Despite the serious injuries F.E. had sustained, Father regularly slept with W.E., who was four years old, when the children were returned to the parents' care on extended visits in September 2020, several weeks before the jurisdictional hearing. The evidence thus shows that a current risk of harm remained.

Father's attempt to liken his situation to that in *In re J.N.* (2010) 181 Cal.App.4th 1010 (*J.N.*) is unavailing. In that case, the evidence reflected a single instance of drunk driving, which resulted in physical harm to the children, but the evidence did not support that either parent had an alcohol abuse problem, any history of substance abuse, or any

15

history of other endangering conduct. (*Id*. at pp. 1014-1015, 1025-1026.) The court noted that "[i]n evaluating risk based upon a single episode of endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances," including, among other things, "evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim." (*Id*. at pp. 1025-1026.) The court determined that these factors warranted reversal of the jurisdiction finding in *J.N.*, but noted that, under different circumstances, "[t]he nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient . . . to establish current risk depending upon present circumstances." (*Id*. at p. 1026.)

Here, unlike in *J.N.*, the court was not presented just with a lone instance of endangering conduct. This case does not involve a single isolated act of negligence, and the evidence demonstrates a current risk of harm remained. Even if we were to analyze the evidence as presenting a "single episode of endangering conduct" under the principles set forth in *J.N.*, "the nature of the conduct and all surrounding circumstances" support the juvenile court's jurisdictional finding. (*J.N.*, *supra*, 181 Cal.App.4th at pp. 1025-1026.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

SLOUGH
J.